611 S.E.2d 309

The STATE, Respondent,

v.

Kristopher M. MILLER, Appellant.

No. 3952.

Court of Appeals of South Carolina.

Submitted Jan. 1, 2005.
Decided Feb. 28, 2005.
Rehearing Denied April 22, 2005.

---

Assistant Appellate Defender Aileen P. Clare, of Columbia, for Appellant.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Assistant Attorney General Deborah R.J. Shupe, all of Columbia; and Solicitor Druanne Dykes White, of Anderson, for Respondent.

BEATTY, J.:

Kristopher Miller was fourteen years old at the time he was charged with the murder of his father. On appeal, he argues the circuit court was without jurisdiction to accept his guilty pleas to voluntary manslaughter and possession of a weapon during the commission of a violent crime because the family court erroneously waived jurisdiction. We affirm.[1]

## FACTS

On January 2, 2001, Miller shot his father, Steve Miller, nine times. Miller then dragged his father's body into the bedroom, covered it with blankets, and locked the bedroom door. Unable to clean the blood in the living room, Miller placed a blanket over the bloodstains. Shortly thereafter, Miller called his paternal grandfather, Dr. Lee Miller, and step-grandmother, Joann Bock, and expressed concern that his father had left the home with someone. He told them that he was frightened and did not want to be alone. Miller left a note stating that he had gone to his grandfather's home. When his grandfather arrived, Miller was standing in the yard

---

1. Because oral argument would not aid the court in resolving the issues on appeal, we decide this case without oral argument pursuant to Rule 215, SCACR.

and would not let him enter the home. According to Bock, Miller appeared "very, very normal."

At his grandfather's home, Miller played computer games while Bock prepared dinner. Before eating, Miller asked for a nailbrush so that he could scrub his nails. Some time during the evening, Miller called his father's home and left a message on the answering machine. In the message, Miller informed his father of where he was that evening and then left his grandfather's telephone number.

Because several hours passed without hearing from his son, Dr. Miller became concerned and called the South Carolina Highway Department as well as several local hospitals to determine whether his son had been in an accident. When his investigation failed to reveal any information, he filed a missing person's report with the Pendleton Police Department. Around 10:30 p.m., officers arrived to start an initial report.

The next day, Miller, his grandfather, and Bock went to Miller's home. During the drive, Miller commented, "I just hope Dad's okay." When they entered the home, they found a blanket covered with bloodstains on the living room carpet. Dr. Miller followed the bloodstains down the hall to his son's locked bedroom. After knocking on the door and not receiving any answer, they then called 911.

Deputy Cris Vaughn was dispatched to the Miller residence. When Vaughn kicked open the bedroom door, he discovered Steve Miller's body under several blankets. Investigator Rusty Garrett arrived at the home shortly after Vaughn. Garrett questioned Miller about the last time he saw his father alive. Miller responded that his father had sent him to his room around 2:15 p.m. the previous day when he played with his father's computer without first asking permission. Miller then told Garrett that he called his grandfather after his father left the home with an unidentified male. After Garrett tested Miller's hands for gunshot residue, Miller told Garrett that his father had raped him and that he could not take it anymore.

Investigator Garrett then transported Miller to the law enforcement center. Miller gave a statement after being advised of his *Miranda* rights. In the statement, Miller claimed that his father had sexually abused him since he was

ten years old. Miller stated the abuse began again when he returned to his father's home after living with his aunt and uncle from approximately January 1999 until August 2000. Miller further stated that he shot his father when his father attempted to abuse him. In an addendum to the statement, Miller explained how he shot his father and identified the type of weapon that he used.

After a sexual assault examination revealed no physical signs of abuse, Miller gave a second statement in which he admitted that his father had never sexually abused him. He also claimed that he was playing with the gun under his jacket when it accidentally discharged. In a final statement, Miller again admitted that he had lied about being sexually abused. He also stated that the gun went off accidentally but he panicked and kept pulling the trigger. He added that he retrieved a second gun from under his father's pillow and proceeded to fire at his father until the gun was empty.

On January 4, 2001, the State filed a juvenile petition charging Miller with murder. Pursuant to section 20–7–7605 [2] of the South Carolina Code of Laws, the State moved to transfer jurisdiction to the circuit court. The family court judge heard two days of testimony, which included: (1) details regarding the investigation of the murder; (2) forensic evidence of the crime scene; (3) Miller's family history; (4) Miller's academic performance; (5) Miller's mental and emotional state; (6) Miller's adjustment to the DJJ environment; and (7) the differences between a commitment to DJJ and the adult prison system.

Both sides offered a significant amount of testimony regarding Miller's mental and emotional state before and after the incident. Dr. Craig Williams, who evaluated Miller for the

---

**2.** Section 20–7–7605 provides in pertinent part:

(5) If a child fourteen or fifteen years of age is charged with an offense which, if committed by an adult, would be a Class A, B, C, or D felony as defined in Section 16–1–20 or a felony which provides for a maximum term of imprisonment of fifteen years or more, the court, after full investigation and hearing, may determine it contrary to the best interest of the child or of the public to retain jurisdiction. The court, acting as committing magistrate, may bind over the child for proper criminal proceedings to a court which would have trial jurisdiction of the offenses if committed by an adult.

S.C.Code Ann. § 20–7–7605(5) (Supp.2004).

purposes of the waiver hearing, stated that Miller had an above average intelligence with an IQ of 113. Dr. Williams testified Miller was immature for his age, had poor interpersonal skills, and did not like to be held accountable for his actions. His evaluation also revealed that Miller exhibited depressive symptoms. He characterized Miller's ability to engage in normal activities after the shooting as that of a "very bazaar [sic], confused individual." In terms of Miller's remorse for shooting his father, Dr. Williams testified that Miller "was actually more focused on himself at the time about his, his life." As to Miller's family history, Dr. Williams testified that Miller informed him that his biological mother had abandoned him when he was a year old, his father was verbally and physically abusive, and his father abused alcohol. Dr. Williams acknowledged that Miller was taken into the custody of DSS for a period of time. Dr. Williams felt that Miller could benefit from the highly structured environment in DJJ and the individual and group counseling. Based on his evaluation, Dr. Williams believed that Miller was functioning more as a child as opposed to an adult and, as a result, should be tried as a juvenile. However, he admitted that if Miller were tried as an adult he would still receive the same treatment offered to juveniles.

Dr. Julian Sharman, a clinical psychologist with DJJ, testified that Miller had adapted and done "very well" living in the "special needs wing" at DJJ. He also felt that Miller had gained social maturity and that there was a change in his depressive symptoms. He believed that Miller would benefit from the treatment available at DJJ. Based on his assessment, Dr. Sharman concluded that Miller should be tried as a juvenile. He acknowledged that if Miller were tried as an adult he would remain for a period of time in the juvenile system and would for the most part receive the same services offered in the juvenile system. He noted that if Miller were tried as an adult, he would likely be housed in a secure facility, as opposed to an "open campus," and as a result would not have "quite as many services."

Dr. Elin Berg, a forensic psychiatrist, evaluated Miller at the request of the defense. She diagnosed Miller as having a major depressive disorder, post-traumatic stress disorder, and a reading disorder. She felt Miller did not exhibit psychotic

behavior and there was no evidence of an anti-social personality disorder. She assessed Miller as ten years old in terms of his maturity level. Dr. Berg also believed that Miller was amenable to rehabilitation and could receive individual and group therapy at DJJ. Based on her evaluations, Dr. Berg recommended that Miller be tried as a juvenile.

After the hearing, the family court judge ordered Miller's case to be transferred to circuit court. In his order, the judge outlined in detail the testimony of each witness as well as the substance of significant exhibits, which included a mental competency evaluation. Based on the evidence, the judge concluded, "it is unlikely this Juvenile could be successfully rehabilitated by, or within, the juvenile system, and it is in the best interests of the Juvenile and the community to transfer jurisdiction to the Court of General Sessions."

On January 15, 2002, an Anderson County grand jury indicted Miller for murder and possession of a firearm during the commission of a violent crime. Approximately a week later, Miller pled guilty to voluntary manslaughter and the related weapon charge. The circuit court sentenced Miller to thirty years imprisonment, suspended upon the service of twenty years and five years probation. The court sentenced Miller to a concurrent, five-year term of imprisonment for the weapon charge.

Miller appeals the family court judge's order transferring jurisdiction to the circuit court.

## STANDARD OF REVIEW

The appellate court will affirm a transfer order unless the family court has abused its discretion. *State v. Avery,* 333 S.C. 284, 292, 509 S.E.2d 476, 481 (1998). "The term 'abuse of discretion' has no opprobrious implication and may be found if the conclusions reached by the lower court are without reasonable factual support." *State v. Corey D.,* 339 S.C. 107, 118, 529 S.E.2d 20, 26 (2000); *Engle v. Engle,* 343 S.C. 444, 449–50, 539 S.E.2d 712, 714 (Ct.App.2000) (stating an abuse of discretion occurs when the court is controlled by an error of law or where the order, based upon the findings of fact, is without evidentiary support).

## DISCUSSION

Miller argues the circuit court lacked jurisdiction to accept his guilty pleas because the family court erroneously waived jurisdiction. Specifically, Miller contends the family court judge's factual conclusions are without evidentiary support. We disagree.

In reaching the decision to waive jurisdiction to the circuit court, the family court judge relied on the criteria established in *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966),[3] which have been "implicitly approved as appropriate criteria." *Corey D.*, 339 S.C. at 118, 529 S.E.2d at 26. In assessing whether the family court judge abused his discretion, "we consider the *Kent* factors and emphasize that the serious nature of the offense is a major factor in the transfer decision." *Id.*

As will be discussed, we find the judge sufficiently outlined the factual findings upon which he based his decision

---

3. In approving these factors, our Supreme Court has stated:

   In *Kent*, the United States Supreme Court noted the following criteria for determining whether jurisdiction should be waived under the District of Columbia Juvenile Court Act:
   1. The seriousness of the alleged offense to the community and whether the protection of the community requires waiver.
   2. Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner.
   3. Whether the alleged offense was against persons or against property, greater weight being given to offenses against persons especially if injury resulted.
   4. The prosecutive merit of the complaint, i.e., whether there is evidence upon which a Grand Jury may be expected to return an indictment....
   5. The desirability of trial and disposition of the entire offense in one court when the juvenile's associates in the alleged offense are adults who will be charged with a crime....
   6. The sophistication and maturity of the juvenile as determined by consideration of his home, environmental situation, emotional attitude and pattern of living.
   7. The record and previous [criminal or adjudicative] history of the juvenile....
   8. The prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile (if he is found to have committed the alleged offense) by the use of procedures, services and facilities currently available to the Juvenile Court.
   *Corey D.*, 339 S.C. at 116 n. 4, 529 S.E.2d at 25 n. 4 (citing *Kent*, 383 U.S. at 566–67, 86 S.Ct. 1045).

and those facts are supported by the testimony and evidence presented at the transfer hearing.

Under the first factor, the judge found that there was "no more serious offense to the community" than murder and "that if 'protection to the community' was the sole criteria, there would be no question that waiver to the Court of General Sessions would be necessary." In making this determination, the judge struggled with the testimony that Miller had no history of criminal behavior and the experts indicated that Miller could be rehabilitated within the juvenile justice system. The judge contrasted this testimony with the fact that: Miller possessed above average intelligence; he gave multiple differing accounts of the incident; and he attempted to conceal the crime and create an alibi.

Miller concedes that the offense of murder is serious. There is also evidence supporting the judge's conclusion regarding the protection of the community. Although the psychological experts testified that Miller could be rehabilitated, they also acknowledged that there was no guarantee that Miller would not commit another violent crime. Several of Miller's own family members testified that they were afraid of him. Jeanette and Mark Henry, Miller's paternal aunt and uncle, with whom he stayed for approximately a year and a half preceding the shooting, testified that Miller was forced out of their home because he was suspended from school for bringing a knife and he wrote a note threatening to kill their family. Moreover, the record reflects that Miller did not appear to be remorseful after shooting his father. Dr. Williams specifically testified that Miller "was actually more focused on himself at the time about his, his life." In his statement, Miller admitted that: he attempted to conceal the shooting by cleaning the living room; he hid one of the weapons at his grandfather's home; and he wrote a note and left a voicemail message to explain his whereabouts. Bock also testified that Miller appeared normal after the incident. Investigator Garrett testified that Miller changed his statement several times and ultimately admitted that his father did not sexually abuse him, which was the reason Miller initially gave as prompting the shooting.

Regarding the second factor, the judge found the evidence established that the "crime was committed in an aggressive, violent and wilful manner; and that premeditation cannot be excluded from the scenario or sequence of events occurring on January 2, 2001." The testimony of the investigating officers and the forensic evidence supports the judge's conclusion. Dr. Woodard, the forensic pathologist, testified that the victim had nine gunshot wounds, which included three to the front of the body, one to the right side, three to the back, and two to the left side of the head. He further testified the pattern of the wounds was consistent with the victim crawling on the ground while being shot. Investigator Mike Mitchell testified the crime scene evidence indicated that the victim was lying on the floor when he was shot in the head. He further explained the evidence indicated that the shooter was "tracking" the victim. Dorothy Filiatreault, a SLED forensic chemist, testified the victim was shot a few times at close range. Miller also admitted, and the forensic evidence corroborated, that he shot his father using two separate weapons. Additionally, one could infer premeditation from Miller's act of shooting the weapon through his jacket.

With respect to the third, fourth and fifth factors, there is no dispute that evidence supports the judge's findings. Without question, the offense of murder was committed against a person. Moreover, Miller concedes that the evidence "might sustain an indictment for murder." Miller also admits that the fifth factor is inapplicable to his case given there were no co-defendants involved in the shooting.

In terms of the sixth factor, the judge indicated that this factor "created the greatest dilemma" apparently because of the conflicting evidence presented by the defense and the State. The judge outlined this evidence and ultimately concluded, "[t]he sheer violence of the murder, and the Juvenile's elaborate efforts to create an alibi and/or conceal evidence, . . . show a degree of intellect and sophistication even *beyond* the age of this Juvenile."

As evidenced by the judge's order, it is clear that he considered all aspects of Miller's life in reaching this conclusion. Although, as the judge recognized, there was evidence that Miller had a difficult home life, he was assessed as

immature for his age, and he was a loner, there was also evidence weighing in favor of transferring jurisdiction to the circuit court. Miller's allegations of abuse were never substantiated other than for limited testimony that Miller's father had been on occasion physically and verbally abusive and the inference from Miller's limited stay in the custody of DSS four years prior to the incident. A physical examination of Miller after the shooting did not reveal any evidence of sexual abuse. After the examination, Miller in fact admitted that he had lied about the sexual abuse. Moreover, Miller spent time away from his father when he lived with other relatives. By all accounts, Miller had a good relationship with his paternal grandfather and step-grandmother. Miller's maternal grandmother, Carol Click, also testified that Miller spent summers with her family. Miller also lived for approximately a year and a half with his paternal aunt and uncle, Jeanette and Mark Henry, until they felt he was a threat to their family. Furthermore, even though Drs. Williams, Sharman, and Berg diagnosed Miller with depression and an anxiety disorder, they found no evidence for which to classify Miller as having a definitive anti-social disorder.

As to the seventh factor, there is no evidence that Miller had any prior criminal record or adjudicative history.

█ Concerning the final factor, the judge found that "if this Juvenile was to remain within the jurisdiction of the Family Court and be adjudicated delinquent and sentenced as required by law, he could *not* be successfully rehabilitated by any program, or by any combination of programs, presently offered by this State's juvenile system." As a result, the judge believed "that after the Juvenile completed his period of juvenile detention, there would remain a constant risk to the community that certain stressors placed on this Juvenile, even as he entered adulthood, might result in his sudden, violent response to, or against, the cause of the stress." Although there is evidence to support the judge's implicit finding that Miller would only serve a limited amount of time in DJJ if tried as a juvenile, we find there is no evidence to support his conclusion that Miller could not be successfully rehabilitated by any program offered in the juvenile system. All of the psychological experts as well as Marlene McClain, a former member of the juvenile parole board, recognized that if Miller

were tried as a juvenile he may only spend thirty-six to forty-four months at DJJ. However, they all believed that Miller could benefit from treatment that he would receive at DJJ. Dr. Berg specifically testified that she believed Miller was "amenable to rehabilitation." Even Dr. Williams, who indicated that Miller may be difficult to rehabilitate, ultimately concluded that "[g]iven [Miller's] level of cognitive ability, with tutoring, therapeutic support, and a structured environment, he might perform more adequately at school and might be able to develop vocational skills." Therefore, we find the judge erred in reaching his conclusion regarding the eighth *Kent* factor.

## CONCLUSION

We find there is evidence to support the family court judge's ruling regarding all of the *Kent* factors with the exception of factor eight, which involves Miller's potential for rehabilitation within the juvenile system. Because, however, there is evidence in the record to support the family court judge's overall decision to waive jurisdiction over Miller to the circuit court, we hold he did not abuse his discretion. Therefore, the circuit court had jurisdiction to accept Miller's guilty pleas. Accordingly, Miller's convictions and sentences are

**AFFIRMED.**

HUFF and KITTREDGE, JJ., concur.